IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PFS INVESTMENTS INC.,

                Plaintiff,

  v.

TIMOTHY THOMPSON,

                Defendant.

OPINION and ORDER

23-cv-50-wmc

---

Plaintiff PFS Investments Inc. ("Primerica") and Terra Wealth Management, LLC compete in the consumer financial services industry.  Defendant Timothy Thompson worked with Primerica for 33 years before joining Terra Wealth in September 2022.  Primerica brought this action against Thompson for preliminary injunctive relief, claiming irreparable harm because Thompson allegedly misappropriated trade secrets before leaving Primerica for Terra Wealth and is in breach of his restrictive covenants.  The court held a telephonic hearing on Primerica's motion on February 16, 2023.  For the reasons below, the court will deny Primerica's request for a preliminary injunction; and since the remainder of dispute must proceed to arbitration by agreement of the parties, will close this case.

FINDINGS OF FACT[1]

---

[1] The parties did not present evidence at the February 16 hearing, so the court has found the following facts based on Primerica's proposed findings of fact and Thompson's responses, as well as the underlying evidence in the record submitted by both parties.  In resolving a motion for preliminary injunctive relief, the court does not accept a plaintiff's allegations as true, nor does it resolve all reasonable inferences in its favor. *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791–92 (7th Cir. 2022).  Instead, the court reviews the record from a neutral and objective viewpoint, finding facts as they are likely to be decided after more complete discovery and litigation. *Id.*

## A.   Background

Plaintiff Primerica is a registered broker-dealer with the Financial Industry Regulatory Authority (FINRA) that operates a financial services business through an organization of independent contractor sales agents.  Primerica agents market securities products, including annuities and mutual funds, as well as term life insurance and other products and services. Sales agents work initially as part of a "base shop," which is generally overseen by a regional vice president who earns commissions on products sold by agents in the base shop.  Typically, regional vice presidents have worked with Primerica for several years and have significant involvement and influence in recruiting, instructing and supervising the junior, or downline, agents in the base shop.

Plaintiff Thompson worked as a Primerica-affiliated financial advisor in Wisconsin for 33 years, ultimately becoming a regional vice president and growing a business that generated approximately $280,000 in annual cash flow.  During Thompson's last 12 months with Primerica, roughly half of his compensation was created though his management of client assets, with the other half coming from fees generated by downline members of his "commission hierarchy."

Thompson signed three agreements with Primerica during his affiliation with the company.  First, shortly after he started working with Primerica, he signed an "Independent Contractor Agreement," which included restrictive covenants prohibiting Thompson from, among other things, misusing, retaining or taking confidential information regarding Primerica's clients or representatives.  Second, he later signed a Representative Agreement, which contained a covenant prohibiting his solicitation of any Primerica customer for the

purpose of inducing the customer to reduce, terminate or replace their Primerica products. Third, when promoted to the position, Thompson signed a Regional Vice President Agreement, which prohibited him from directly or indirectly soliciting any Primerica agent to reduce the agent's Primerica activity.

Thompson was a successful Primerica agent and used his many connections within his community to retain customers and gain referrals. He also recruited his family to join Primerica, with both his wife and two sons becoming Primerica agents.

**B. Thompson's Growing Frustration and Decision to Leave Primerica for Terra Wealth**

By 2021, Thompson was frustrated with Primerica's lack of a "service-oriented model" and shared with other Primerica agents that he wanted to offer additional products and services to his customers. This frustration was allegedly fueled by the customers he had lost, who felt they had grown too wealthy for Primerica's offerings. By early 2022, Thompson had concluded that Primerica did not intend to improve its services model; and by April 2022, Thompson had decided to leave Primerica. After Thompson told his family of his decision, his sons responded that they, too, had decided to leave the company.[2]

Around this time, Thompson heard from other Primerica agents that a group of former agents were forming a new wealth management firm, Terra Wealth Management. Thompson began researching Terra Wealth, then contacted the founders to learn more. During May

---

[2] One of Thompson's sons, Taylor Thompson, testified at his deposition that he hated Primerica, had wanted to leave the company for years, and had investigated Terra Wealth as soon as he heard about it. (Taylor Thompson Dep. (dkt. #7) at 29, 30, 41.)

2022, Thompson and his sons also attended Zoom meetings with the Terra Wealth founders to find out more about the company.

Further, starting in late May or June 2022, Thompson began meeting, individually, over dinner, with downline agents within his commission hierarchy to tell them of his decision to leave Primerica. According to Thompson, half of his downline agents told him that they planned to leave Primerica as well, and some of his agents were already interviewing with other companies. (Thompson Dep. (dkt. #6) at 100–102.) And when his agents asked what he was going to do, Thompson acknowledges telling them that he and his wife were "deeply exploring" Terra Wealth, and they could contact Terra Wealth for more information if they were interested. (*Id.*)

During the summer of 2022, Thompson, his wife, his sons and other Primerica agents, including some of Thompson downline agents, attended several more Zoom meetings with the Terra Wealth team, during which they asked questions about the company's structure, technology and service model. Meanwhile, throughout the summer, Thompson continued to meet with and service his Primerica clients, accessing confidential customer information through Primerica's proprietary computer system, and receiving compensation from Primerica. According to Thompson, he deliberately waited to join Terra Wealth until the company was established and ready for him to service his clients immediately. (*Id.* at 112.)

In August 2022, Thompson retained counsel to assist him with his transition, and paying his counsel's fees for legal services while he was still affiliated with Primerica, although Terra Wealth had assured Thompson that if he followed his counsel's advice and the proper protocol for resigning, it would cover any legal fees arising after his transition. Finally, at some point during the summer, Thompson provided information to Terra Wealth about the assets he  managed at Primerica related to his own production, as well as the production of his

downline agents.[3]  Thompson also provided Terra Wealth with a breakdown of the products held by his customers.

### C.  Thompson's and His Downline Agents Coordinated Resignations on the Same Day

Thompson submitted his resignation to Primerica on September 16, 2022.  On that same day, 28 individuals resigned from Primerica, including 18 representatives who were Thompson's downline agents.  According to Thompson, he and several others had talked on Zoom before September 16 to ensure that they all would be ready to resign on that day.  (*Id.* at 94, 96.)  Thompson and his 18 downline agents also submitted nearly identical resignation letters, which Thompson testified was provided at least to him by his attorney.  Just before his resignation, Thompson had also deleted everything in his email accounts and on his work computer that related to Primerica, its clients or representatives.  Thompson testified he did so because his counsel had told him not to take anything with him from Primerica.  Later, Thompson was told that he should not be deleting information, so he packed up the remainder of his Primerica-related documents then mailed them to Primerica.

Within hours of resigning from Primerica, Thompson and his family members began notifying his Primerica customers of his departure.  As a result, his former Primerica customers began calling him as early as the evening of September 16, asking him what his departure meant for them.  In response, Thompson told customers that he had left Primerica and was joining Terra Wealth.  He further advised that they could either: (1) stay with Primerica; (2) transition to a new financial firm with a new advisor; or (3) move their accounts to him at Terra Wealth.  (*Id.* at 6–16.)  According to Thompson, he mainly communicated with clients that he had

---

[3]  According to Primerica, the Terra Wealth founders had already independently obtained information about Thompson's and other agents' assets under management in January 2022, well before they left Primerica.  (Thompson Dep. (dkt. #6) at 48–51.)

known for 30 or 40 years, based on his relationships with his family, church and community. He also claimed that "[t]here [we]re hundreds of clients I didn't take with me that I didn't have those relationships with.  The ones that came with me are people that I had that relationship with."  (*Id.* at 43.)

One month before Thompson's departure, the total asset value of Primerica customer accounts managed by Thompson and 12 of the 18 Primerica agents who left with him was $83,443,183.68.  As of January 5, 2023, the value of assets in these same accounts was approximately $40 million, approximately a 52% drop in assets under management since Thompson's departure in those accounts alone.

Primerica filed this lawsuit against Thompson on January 23, 2023, some four months after he had left, claiming breach of fiduciary duties and contractual obligations under various terms of his three employment agreements.  Primerica also alleges violations of the U.S. Defend Trade Secrets Act and the Wisconsin Uniform Trade Secrets Act.  Initially, Primerica solely sought a temporary restraining order, which was converted to a motion for preliminary injunctive relief, with both parties agreeing that the final merits of Primerica's claims must be decided in arbitration under the FINRA Code of Arbitration Procedure for Industry Disputes. Thus, the only question for this court is whether Primerica has shown that the court should enter preliminary injunctive relief.

## OPINION

Preliminary injunctive relief is an "extraordinary equitable remedy that is available only when the movant shows clear need."  *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015); *see also Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (quoting *Winter v. Natural*

*Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)).  To obtain a preliminary injunction, Primerica must show that: (1) it has some likelihood of prevailing on the merits; (2) traditional legal remedies would be inadequate; and (3) it will suffer irreparable harm without the relief. *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020); *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018).  If Primerica fails to demonstrate any one of these three, threshold requirements, the court must deny the injunction.  *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).  If Primerica passes these thresholds, the court proceeds to a balancing analysis, weighing the harm Primerica would suffer absent a preliminary injunction against the harm Thompson would suffer were a preliminary injunction issued, as well as considering whether an injunction is in the public interest.  *See Planned Parenthood of Ind. & Ky.*, 896 F.3d at 816; *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

### I.  Likelihood of Success on the Merits

The first question is whether Primerica has shown that it is "likely to succeed on the merits" of at least one of its claims.  *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits.")  Here, Primerica moves for preliminary injunction based on its claims for (1) breach of contracts, (2) breach of fiduciary duty, and (3) misappropriation of trade secrets.  As the court discussed with the parties during the preliminary injunction hearing, Primerica has not shown a likelihood of success on its misappropriation of trade secrets claim, having failed to identify any information that Thompson took from Primerica that would qualify as a trade secret under Wisconsin or federal law.  *See* 18 U.S.C. § 1839(3) (federal definition of "trade secret"); Wis. Stat. § 134.90(1)(c) (Wisconsin definition of "trade secret").

7

However, as also discussed in detail at the hearing, Primerica has shown some likelihood of success on its claims that Thompson breached the terms of at least one of his contracts, as well as his fiduciary duties to Primerica, by helping Terra Wealth orchestrate the move of 18 of his downline agents, on the same date as his own resignation, and by engaging in arguably improper communications with customers after his resignation. Specifically, based on the evidence submitted thus far, a trier of fact could reasonably find that, although Thompson may have tried to follow proper protocols in resigning from Primerica, his communications with his downline agents and customers regarding his and their moves to Terra Wealth crossed the line into solicitation in violation of his contracts and fiduciary duties to Primerica as a regional vice president. (Hear. Trans. (dkt. #40) at 22–23.)

Thompson makes several arguments as to why Primerica's breach of contract and fiduciary duty claims would ultimately fail, including that: (1) some of the restrictive covenants in his contracts are unenforceable under Wisconsin law; (2) he did not owe a fiduciary duty to Primerica that prohibited the actions he took; and (3) his communications with his customers and downline agents did not amount to solicitation in violation of his contracts, fiduciary duties or FINRA rules. At best, however, these are arguments that will have to be decided *on the merits* by the parties' arbitrators since Primerica has shown at least some likelihood of success on its breach of contract or breach of fiduciary duty claims.

## A. Irreparable Harm and Inadequate Legal Remedy

Where Primerica's preliminary injunction motion falls short is a failure to show "that it has no adequate remedy at law" and "that without [injunctive] relief it will suffer irreparable harm." *See Planned Parenthood of Ind.*, 896 F.3d at 816 (citation omitted). For preliminary relief to be granted, irreparable harm must be "likely." *Michigan v. U.S. Army Corps of Engineers*, 667

8

F.3d 765, 788 (7th Cir. 2011).  Harm is "irreparable" if legal remedies available are inadequate, meaning they are "seriously deficient as compared to the harm suffered." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021).  In considering whether a plaintiff has shown likely irreparable harm and an inadequate remedy at law, courts should consider whether the requested preliminary injunction would actually prevent or reduce the harm alleged by the plaintiff.  *Michigan*, 667 F.3d at 789–90.

At the preliminary injunction hearing, the court explained to Primerica's counsel that language in the proposed injunction was fatally vague and over broad in seeking to prohibit a wide range of general activities and not tailoring it to the narrower, solicitation-based claims on which it has shown some likelihood of success.  (Hear. Trans. (dkt. #40) at 4, 8.) Accordingly, the court directed Primerica to narrow its injunction request to the following activities:  (1) further soliciting the now two, remaining Primerica agents in Thompson's downline, commission hierarchy; and (2) further soliciting current Primerica customers with whom Thompson or his downline agents had worked.  Indeed, any preliminary injunction encompassing those two categories would need to be further narrowed to account for the limited reach of the prohibitions in Thompson's contracts.  Thus, the question for the court is whether Primerica has shown at least some likelihood of suffering irreparable harm without preliminarily enjoining prohibiting Thompson from engaging in these two specific kinds of solicitations.

First, the court notes that Primerica has offered little to no evidence to support its purported concern that Thompson will improperly solicit the two, remaining downline agents in his hierarchy or other Primerica agents with whom he may have worked or interacted.  With respect to the downline agents, Thompson has conceded that he met with all his downline agents to discuss his departure from Primerica in June 2022, and Primerica has submitted no

evidence that:  Thompson has met or talked to these two agents already; he is currently in communication with those agents; or he would have any reason to pursue those particular agents now.  At this point, Thompson's departure is not a secret, and any agent who was inclined to leave due to Thompson's departure likely would have done so already.  Absent some evidence of Thompson's continued solicitation of these two or any other current Primerica agents, there is no basis for this court to find irreparable harm.  In addition, since it would surely lead to this court's entry of preliminary injunctive relief, *and* the arbitrator's likely enhancement of any damage award, Thompson would be well advised not to even come close to the line of that kind of solicitation, directly or indirectly.

Second, as for current Primerica customers, Primerica asserts that there are "hundreds" of Thompson's customers that he could still target for solicitation.  Again, however, Primerica offers no evidence that Thompson is likely to do so.  For example, Primerica has offered *no* information about potential or remaining customers that Thompson has targeted, is currently targeting or is likely to target other than those he has spoken to already.  To the contrary, Primerica's assertion that Thompson has "hundreds" of remaining clients at Primerica is based entirely on his statement at his deposition that, upon resigning from Primerica, he contacted only customers with whom he had a long-time relationship, but did not contact "hundreds of clients" with whom no such relationship existed.  (Thompson Dep. (dkt. #6) at 43.) Primerica's reliance on this statement to show likely, further harm is a stretch, at best. Moreover, despite this court's expressed concern, Primerica offers no evidence that would permit such an inference.  For example, there has been no showing that Thompson is continuing to contact these other customers, most of whom he likely had no direct personal relationship with, nor that Thompson would even have their contact information to do so. Rather, at the hearing, Primerica's counsel merely stated that despite Thompson's assertions

10

that he has had no interaction with Primerica's remaining customers, counsel "thinks" Thompson knows who those customers are.  (Hear. Trans. (dkt. #40) at 57.)  But counsel's belief cannot support a showing of irreparable harm.  Finally, Primerica is welcome to renew its request were Thompson foolish enough to contact, much less solicit, *any* of Primerica's existing customers, directly or indirectly.[4]

In sum, Primerica's entire assertion of likely, further irreparable harm is based on speculative, future injury that is not well-supported by evidence.  *See Bar Indy LLC v. City of Indianapolis*, 508 F. Supp. 3d 334, 360 (S.D. Ind. 2020) (holding that business' bare allegations of impending loss, without "particularized analysis" or "requisite financial details," are insufficient to meet burden of showing irreparable harm).  To the contrary, that harm, if any, appears to have already occurred, and an injunction prohibiting Thompson or his agents from working with customers who have already moved would do further injury to those third parties.  Moreover, even if Primerica offers evidence that Thompson was likely to engage in improper solicitation of agents or customers in the future, the question remains whether Primerica has shown that it faces irreparable harm in the absence of an injunction prohibiting further solicitation.

Primerica argues that it faces three types of irreparable harm.  First, it says that it will suffer irreparable harm through Thompson's continued, unauthorized disclosure of confidential information, including customer information.  However, as explained by the court above and at the hearing, Primerica has offered no evidence that Thompson has retained, much

---

[4] At oral argument, defendant's counsel complained that Thompson and his downline agents at Terra Wealth would not necessarily *know* who current Primerica customers were.  However, defendant and those downstream agents would be well advised to *ask*, rather than risk entry of a preliminary injunction pending completion of the underlying suit.

less used, Primerica's confidential information, nor that he is likely to continue doing so in a way that would cause further irreparable harm to Primerica.

Second, Primerica says that it will incur harm to its business reputation and will lose customer confidence and goodwill if Thompson continues to solicit its customers and agents. However, Primerica fails to explain how its customer confidence, reputation or goodwill will be further damaged absent an injunction.  The reality is that Primerica already lost 28 agents to Terra Wealth on the same day that Thompson left, and by all appearances, a significant amount of customer accounts shortly after.  But that was five months ago.  As a result, if Thompson's actions damaged Primerica's reputation or goodwill, that harm has occurred already.  Even if Thompson successfully solicited the two remaining downline agents or a few more Primerica customers, there is no evidence that Thompson would do so by disparaging Primerica, or that such solicitation would cause additional, irreparable reputation damage.  *See Saddler v. Hewitt*, No. 19-CV-81-JDP, 2020 WL 1689682, at *2 (W.D. Wis. Apr. 7, 2020) ("An injunction is a forward-looking remedy, so [plaintiff] needs to explain why the facts *as they exist right now* warrant court intervention.") (emphasis added).

Primerica's third argument is the most plausible.  Primerica contends that lost sales and potential referrals from agents and customers illegally, wrongfully solicited by Thompson would necessarily be irreparable losses, because they are incalculable.  Specifically, Primerica argues that it would not only be impossible to determine the number of future customers that Thompson and his downline agents will solicit or induce to transfer their accounts, and more to the point, it will be impossible to determine the *amount* that Primerica will lose in profits from those potential customers.  Although Thompson counters that lost sales generally do not constitute irreparable harm, particularly where business records enable the plaintiff corporation to calculate the amount of lost sales, the sides will likely take exactly opposite positions before

12

the arbitrator, when Primerica tries to quantify lost future sales attributable to customers who followed Thompson and his recruited agents to Terra Wealth.

Certainly, the most difficult loss to quantify would be the loss of referral business and additional sales opportunities from any customers who transferred their business from Primerica to Terra Wealth as a result of Thompson's or his downline agents' solicitations. Primerica argues that such loss is irreparable because it is impossible to track and calculate the exact amount of the financial harm caused by the loss of potential referral sources. While the court is somewhat sympathetic to this argument, Primerica has simply not provided sufficient evidence to support it. Its only evidence relating to referral business is a statement in the declaration of a Primerica's national sales director, who states that existing clients "provide referrals from their network of family and friends and those referrals often become Primerica clients," and "in [her] experience, the commissions from such referrals is significant." (Donna Travis Dec. (dkt. #10) ¶ 13.) This is simply insufficient to support Primerica's assertion that additional customer referral business will be impossible to track, particularly when Primerica likely tracks referral business, as likely does Terra Wealth. More specifically, Primerica has not adequately explained why it would be unable to determine, or at least estimate, the amount of referral business, and new sales it will lose, if any, from the limited pool of customers at issue: customers from whom Thompson earned a commission and who are currently at Primerica, but who later change their business to Terra Wealth as a result of an improper solicitation from Thompson.

As Primerica conceded, the harm from lost referrals or new sales is, ultimately, loss of new clients and commissions. If Primerica is able to prove during arbitration that Thompson improperly solicited any of its remaining customers, Primerica should be able to use its and Terra Wealth's records to determine the amount of commissions, if any, it lost due to lost

13

referrals from those customers.  However, the real problem with plaintiff coming to the court

for relief some five months after Thompson and his downline agents left is that any injunction

Primerica is asking for *now* will not change the burden of proving the monetary loss of that past

action, because even it is not asking the court to order that Thompson put already lost agents

and customers back into the proverbial tube.  Nor would this court consider doing so with

respect to customers.

For all these reasons, Primerica has failed to make a persuasive showing of irreparable

harm that would justify a preliminary injunction.  Of course, if Primerica has evidence that

Thompson or his downline agents are foolish enough to engage in any solicitations of its agents

or customers the result may very well be different.  However, because Primerica has not shown

a likely risk of further irreparable harm that this court's preliminary injunctions might prevent,

the court need not balance the harms that would result from the grant or denial of an

injunction.  *See Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1326 (7th Cir. 2022).

Accordingly, the court will deny Primerica's motion and dismiss this case without prejudice in

favor of the parties' pending arbitration proceedings.

ORDER

IT IS ORDERED that:

1. Plaintiff PFS Investments Inc.'s motion for a temporary restraining order or preliminary injunctive relief (dkt. #3) is DENIED.

2. The clerk of court is directed to enter judgment and close this case, subject to reopening upon good cause shown.

   Entered March 2, 2023.


                          BY THE COURT:

                          /s/

                          _____
                          WILLIAM M. CONLEY
                          District Judge

15